UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-61520-Civ-SCOLA/SNOW

Alfredo Marquez, Jr., individually and on
behalf of all those similarly situated,

Plaintiffs,

v.

Flextronics America, LLC, "Subsidiaries of
Flextronics International Holding Corp.
Severance Plan (for RTS Retail Employees),"
Flextronics Severance Plan Committee, Tom
Ezrin, Keith Beatts, Suz Ramsey, Sonji Winters,
and Flextronics International Holding, LLC,

Defendants.
_____/

## ORDER GRANTING MOTION TO DISMISS

Plaintiff Alfredo Marquez is suing his former employer and related entities, alleging that their failure to pay him severance benefits under his former employer's severance plan violated several provisions of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. Defendants move to dismiss his Second Amended Complaint for failing to state a valid claim. (DE 31.) For the reasons set forth below, the Court **GRANTS** the Defendants' Motion (DE 31) and **DISMISSES** the Second Amended Complaint **without prejudice**.

### BACKGROUND

Marquez is a former employee of Flextronics America, LLC (Flextronics) who worked as a retail services technician in the division called "Retail Technical Services – Verizon Wireless" (RTS). (DE 28 at 2.) Flextronics had a contract with Verizon Wireless (Verizon) whereby employees in the RTS division such as Marquez would work in Verizon stores and provide technical support to Verizon customers. For these employees, Flextronics has created a severance plan (the Plan), which provides qualifying employees severance benefits. The Plan is governed by the Employee Retirement Income Security Act (ERISA). One requirement to qualify for the Plan is that the employee must be involuntarily terminated. (DE 28-1 at 4.)

In May 2011, Marquez received a letter from Flextronics informing him that Flextronics was terminating him and many other employees in the RTS division because Verizon had elected to terminate its contract with Flextronics. The letter indicated that Marquez's official termination date would be August 31, 2011.

This change was precipitated by Verizon's deciding to bring the technical-support services offered by Flextronics's RTS division in house. Verizon thus planned to hire many of the Flextronics employees who would be laid off, and Flextronics encouraged those employees to apply for work at Verizon. On June 28, 2011, Verizon contacted many of those employees, including Marquez, and offered them employment, starting August 29, 2011. After several contacted employees complained, Verizon changed the start date to September 1, 2011. Verizon later retracted the September 1 start date and returned the start date to August 29. When Verizon called Marquez about his job offer and emphasized that his start date was August 29, Marquez complained that this start date was not feasible because his employment with Flextronics lasted until August 31. Verizon responded by saying that the August 29 start date was what Flextronics had told Verizon to do. (DE 28 at 5-6.)

Marquez asserts that there was no legitimate business reason for Verizon to require a start date before September 1. He instead alleges that Verizon's decision to require an August 29 start date was solely the result of a collusive agreement between Verizon and Flextronics. And he implies that the agreement's purpose was to deny him and similarly situated Flextronics employees severance benefits.

Marquez worked through at least August 27, 2011 before accepting the position offered by Verizon. He filed a timely claim for severance benefits under the Plan. Flextronics denied Marquez's claim on the grounds that he was ineligible for benefits because he "voluntarily resigned his position prior to the Severance Date of 8/31/11 to work for Verizon Wireless." (*Id.* at 7.) After unsuccessfully appealing this denial, Marquez initiated this lawsuit on August 3, 2012.

Marquez amended his complaint in December 2012 so that it now includes six counts under ERISA and one count under the Declaratory Judgment Act. He sues Flextronics, Flextronics International Holding, LLC (Flextronics International), the Flextronics Severance

Plan Committee (the Committee), the Committee Members, and the Plan.[1]  The Committee is a named fiduciary of the Plan and is empowered to designate the plan administrator. (DE 28-1 at 6-7.)  The Committee Members are Tom Ezrin, Vice President of Total Rewards; Keith Beatts, Senior Director of Finance; Suz Ramsey, U.S. Benefits Director; and Sonji Winters, Plan Administrator.

Marquez's six ERISA claims are (1) that Defendants violated ERISA § 510, 29 U.S.C. § 1140, by interfering with his protected rights; (2) that Defendants violated ERISA § 404, 29 U.S.C. § 1104, by breaching their fiduciary duties; (3) that Flextronics violated ERISA § 404 by engaging in self-dealing, thereby breaching its fiduciary duty; (4) that Flextronics, the Plan, and the Committee violated ERISA by breaching their fiduciary duty to monitor appointees; (5) that Defendants violated ERISA by breaching their fiduciary duty to fairly decide benefits claims; and (6) that Defendants are jointly and severally liable for each other's breaches of fiduciary duty under ERISA § 405, 29 U.S.C. § 1105.  For Claims 2 through 4, Marquez uses § 502(a)(3) as the basis for his cause of action; for Claim 1, § 502; for Claim 5, § 502(a)(1)(B)[2]; and for Claim 6, § 405.[3]  As a remedy for the alleged ERISA violations, Marquez asks the Court to hold that Defendants are estopped from arguing that he and similarly situated employees failed to

---

[1] The Plan can be sued as a separate entity under ERISA: "[a]n employee benefit plan may sue or be sued under this subchapter as an entity." 29 U.S.C. § 502(d)(1).

[2] Although Marquez cites to both § 502(a)(1) and § 502(a)(3) in Claim 5, his reference to § 502(a)(3) is a typo because the language that follows this reference—that "the class is entitled to recover benefits due to them under the terms of the Plan, to enforce their rights under the terms of the Plan, or to clarify their rights to future benefits under the terms of the Plan" (DE 28 at 14)—matches § 502(a)(1)(B)'s language almost word for word.

[3] Although denominated as a separate claim, the Court doubts that Claim 6 as pled is really a separate cause of action.  Claim 6 cites only to § 405. (DE 28 at 14.)  This section specifies when a fiduciary is liable for another fiduciary's breach of fiduciary duties. 29 U.S.C. § 1105(a).  It does not itself authorize a plan participant such as Marquez—or anyone, for that matter—to sue a fiduciary when that fiduciary is liable for another fiduciary's breach. *See id.*  In other words, it describes circumstances in which a fiduciary is liable, but it does not authorize a suit to capitalize on this liability.  Other provisions of ERISA do authorize such a suit—for example, § 502(a)(3) authorizes certain persons to sue fiduciaries when they breach a fiduciary duty.  So a plan participant could bring a single claim against fiduciary X and fiduciary Y under § 502(a)(3), alleging that X breached one of the fiduciary duties outlined in § 404 and that Y is liable for X's breach under § 405.  That claim properly couples the liability described in § 405 with another provision authorizing the injured party to sue.  But in Claim 6, Marquez does not cite to an ERISA provision authorizing him to sue. (*See* DE 28 at 14.)  In any event, the Court need not decide whether Marquez's Claim 6 is properly pled because the Court concludes that no Defendant breached its fiduciary duties under ERISA.

work through their termination date; to deem him and similarly situated employees to have not voluntarily terminated their employment with Flextronics so that they are eligible for full severance benefits; to reform the Plan so that it provides that if Flextronics arranges for participants to be hired less than one week before their termination date, then those participants are not considered to have voluntarily resigned; and to order Defendants to pay him and similarly situated employees the severance benefits they were owed "under the Plan as applied by estoppel or reformation." (DE 28 at 9-13.)

Marquez's final claim against Defendants is brought under the Declaratory Judgment Act against Defendants. He asks the Court to declare (1) that he and similarly situated employees have not voluntarily terminated their employment with Flextronics, thereby making them eligible for full severance benefits, and (2) that the Plan should be reformed so that it provides that if Flextronics arranges for participants to be hired less than one week before their termination date, then those participants are not considered to have voluntarily resigned. (*Id.* at 15.)

Defendants move to dismiss the Second Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failing to state a valid claim. (DE 31.)

## ANALYSIS

When considering a motion to dismiss under Rule 12(b)(6), the Court must accept all of a complaint's well-pled factual allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Though the Rule does not require detailed factual allegations, it does require "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (brackets, internal citation, and internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* So a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will be dismissed. *Id.*

Faced with a motion to dismiss, a court should therefore "(1) eliminate any allegations in the complaint that are merely legal conclusions; and (2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *American Dental Association v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (internal quotation marks omitted). Moreover, "courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* (brackets and internal quotation marks omitted). "This is a stricter standard than the Supreme Court described in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), which held that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Mukamal v. Bakes*, 378 F. App'x 890, 896 (11th Cir. 2010) (internal quotation marks omitted). These precepts apply to all civil actions, regardless of the cause of action alleged. *Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 138 (11th Cir. 2011).

The Court first turns to Marquez's claims alleging breaches of fiduciary duty (Claims 2-6), then to Marquez's § 510 claim (Claim 1), and finally to Marquez's claim for declaratory relief (Claim 7).

In Claim 3, Marquez alleges that Flextronics breached its fiduciary duties by negotiating an agreement with Verizon under which Verizon would hire Marquez and similarly situated employees before their August 31, 2011 termination date. (DE 28 at 11.) He implies that the agreement's purpose was to deny him and similarly situated Flextronics employees severance benefits.

It is axiomatic that in order for some action to breach a fiduciary duty, the person engaging in that action must be a fiduciary and acting in a fiduciary capacity when taking the challenged action. *See Varity Corp. v. Howe*, 516 U.S. 489, 498 (1996) (analyzing an employer's liability for allegedly breaching fiduciary duties by first deciding whether the employer was acting in its capacity as an ERISA fiduciary when taking the challenged action). ERISA specifically envisions "that employers will act in a dual capacity as both fiduciary to the plan and as employer." *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir. 1986); *accord Varity*, 516 U.S. 498-504. Employers are liable for breaching an ERISA fiduciary duty only when they act as fiduciaries and not as employers. *E.g. Phillips*, 799 F.2d at 1471. So a

threshold question is whether Flextronics was acting as an employer or as a fiduciary to the Plan when it negotiated the agreement with Verizon.

ERISA provides that a "'person is a fiduciary with respect to a plan,' and therefore subject to ERISA fiduciary duties, 'to the extent' that he or she 'exercises any discretionary authority or discretionary control respecting management' of the plan, or 'has any discretionary authority or discretionary responsibility in the administration' of the plan." *Varity*, 516 U.S. at 498 (quoting ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A)). To decide whether an employer was acting in a fiduciary capacity—that is, whether the employer was engaging in "discretionary acts of plan management and administration"—courts should examine whether the employer was performing the duties imposed, or exercising the powers conferred, by the plan; whether the powers exercised "are necessary or appropriate" for carrying out the plan's purposes; or whether the employer is engaging in "activities that are ordinary and natural means of achieving the objective of the plan." *Id.* (internal quotation marks omitted).

*Varity Corporation* provides a useful illustration of these principles in action. The employer Varity Corporation created a new wholly owned subsidiary to transfer debts and money-losing divisions into because if the subsidiary failed, a possibility Varity foresaw, it "would not only eliminate several of Varity's poorly performing divisions, but it would also eradicate various debts that Varity would transfer to [the newly created subsidiary], and which, in the absence of the reorganization, Varity's more profitable subsidiaries or divisions might have to pay." *Id.* at 493. One of these obligations Varity hoped to be relieved from was a welfare-benefit plan for its employees governed by ERISA. *Id.* Varity wanted to persuade its employees in the failing divisions to agree to transfer their employment to the new subsidiary, which also provided a welfare-benefit plan, thereby making the new subsidiary obligated for the employee benefits instead of Varity's more profitable subsidiaries. *Id.* To do this, Varity held a special meeting for the employees where it "talked to them about [the new subsidiaries] future business outlook, its likely financial viability, and the security of their employee benefits. The thrust of Varity's remarks . . . was that the employees' benefits would remain secure if they voluntarily transferred to [the new subsidiary]." *Id.* at 493-94. These remarks were deliberately deceptive. *Id.* at 494, 506. When the new subsidiary ended its second year in receivership, the employees lost their benefits under the plan. *Id.* at 494.

The employees sued Varity for breaching its fiduciary duties under ERISA by deliberately deceiving them. Varity argued, among other things, that the statements and materials it distributed at the special meeting were made in its capacity as an employer, not as an ERISA fiduciary, and that therefore it could not be liable under ERISA. *Id.* at 498.

The Supreme Court rejected this contention. *Id.* at 503. The Court began its reasoning with the district court's unchallenged factual finding

> that the key meeting, to a considerable extent, was about benefits, for the documents described them in detail, explained the similarity between past and future plans in principle, and assured the employees that they would continue to receive similar benefits in practice. The District Court concluded that the basic message conveyed to the employees was that transferring from [their old division] to [the new subsidiary] would not significantly undermine the security of their benefits.

*Id.* at 501. From there, the Court reasoned that the statements Varity made—which "convey[ed] information about the likely future of plan benefits"—"would seem to be an exercise of a power 'appropriate' to carrying out an important plan purpose." *Id.* at 502. Conveying information about a plan to beneficiaries is something plan administrators typically do. *Id.* And the statements made by Varity came from high-level managers who were authorized to communicate as fiduciaries with plan beneficiaries. *Id.* at 503. So, based on "the factual context in which the statements were made, combined with the plan-related nature of the activity, [which was] engaged in by those who had plan-related authority to do so," the correct legal conclusion was that "Varity was acting as a fiduciary." *Id.* Significantly, the majority clarified that it "did not hold, as the dissent suggests, that Varity acted as a fiduciary "simply because it made statements about its expected financial condition or *because an ordinary business decision turned out to have an adverse impact on the plan*." *Id.* at 505 (brackets, internal citations, and internal quotation marks omitted) (emphasis added).

Expanding on this last point, the Eleventh Circuit has underscored that an employer is not acting as fiduciary just because the employer engages in action that is harmful to its employees' benefits under a plan. *Phillips*, 799 F.2d at 1467, 1471. In *Phillips*, Amoco, the employer, maintained a retirement plan for its employees governed by ERISA. *Id.* at 1466. Amoco eventually sold its business to Norgas. *Id.* "The sales contract provided that Norgas would offer employment to each regular full-time employee [of Amoco's] at his or her current salary." *Id.* While the former Amoco employees who took a job with Norgas would receive retirement

benefits under Norgas's plan, the sales contract's terms meant that "years of service with Amoco would not be credited for the purpose of calculating benefits or determining eligibility for early retirement" under Norgas's plan. *Id.* The former Amoco employees thus lost valuable benefits and sued Amoco and Norgas under ERISA. *Id.* at 1467. They alleged, among other things, that "Amoco and Norgas bargained away credit for years of service with Amoco when they negotiated the sales contract, thereby violating . . . the provisions of ERISA" governing fiduciary duties. *Id.* The district court granted summary judgment to Amoco and Norgas. *Id.*

On appeal, the employees "argue[d] that Amoco breached its fiduciary duty in negotiating a higher sale price for its [business] by bargaining away credit for their years of service with Amoco." *Id.* at 1471. The Eleventh Circuit rejected this argument, reasoning that Amoco had acted as an employer, not a fiduciary, when it negotiated away years-of-service credit in the course of selling its business in order to maximize the sale price: "ERISA does not prohibit an employer from acting in accordance with its interests as employer when not administering the plan or investing its assets. *Id.* In other words, an employer's action does not become a fiduciary action simply because that action negatively impacts its employees' benefits under a plan or the plan itself. *See id.* The test is whether the employer is engaging in discretionary acts of plan management or administration, not whether the action harms the benefits of its employees under a plan.

Applying these principles, the Court concludes that Marquez has not plausibly alleged that Flextronics was acting as a fiduciary when it allegedly negotiated the agreement with Verizon over start dates. In negotiating an agreement with Verizon, a third-party company, about when Flextronics's employees would start with Verizon in a mass-layoff situation, Flextronics was acting as an employer, not a fiduciary. Flextronics was not performing the duties imposed, or exercising the powers conferred, by the Plan; it was not exercising powers that were necessary or appropriate for carrying out the Plan's purposes; and it was not engaging in activities that are a natural means of achieving the objectives of the Plan. *See Varity*, 516 U.S. at 502-505. It instead was negotiating with another company over when employees it was laying off en masse would start with that company. Employers certainly have a right to do this. To be sure, the new company need not negotiate with the original employer—let alone reach an agreement with the original employer—but that does not alter the conclusion that the original employer certainly has the right to negotiate and reach an agreement over start dates. Nor does it

transform such a negotiation into a discretionary act concerning plan management or administration. That the resulting agreement may adversely impact the ability of the employees to collect severance benefits under an ERISA plan, as it did in the present case, does not matter. An employer's action does not become a fiduciary action simply because that action negatively impacts its employees' benefits under a plan or the plan itself. *See Phillips*, 799 F.2d at 1471. Because Flextronics was not acting as a fiduciary when it negotiated with Verizon over start dates, the Court *dismisses* Marquez's Claim 3.

That conclusion also compels the conclusion that Claims 2, 4, and 6 must be dismissed as well because there is no plausibly alleged breach of fiduciary duty to support them. Claim 2 is that Defendants breached their fiduciary duties by violating the duties set forth in ERISA § 404(a)(1)(A)(i-ii), (B), (D); Claim 3, that Flextronics, the Plan, and the Committee violated ERISA by breaching their fiduciary duty to monitor appointees; and claim 6, that Defendants are jointly and severally liable for each other's breaches of fiduciary duty under ERISA § 405, 29 U.S.C. § 1105. The alleged breach of fiduciary duty at the heart of all these claims is that Flextronics negotiated an agreement with Verizon over start dates. Marquez admits as much in his brief when he argues that the reason Defendants other than Flextronics are liable for fiduciary breach is because these Defendants were so close to Flextronics that they were "complicit" in Flextronics's "wrongful conduct"—that is, negotiating the deal with Verizon. (DE 35 at 12 n.11.) Since Flextronics was not acting as a fiduciary and thus did not breach any fiduciary duties, there was no wrongful conduct. It follows that the other Defendants cannot be derivatively liable for lawful conduct—regardless of whether that liability is phrased as being joint and several, as emanating from the failure to monitor appointees, or from the fiduciary duties in § 404(a)(1)(A)(i-ii), (B), (D).[4]

---

[4] In case Marquez attempts to replead these claims, the Court cautions him that the claims as pled may be insufficient even if the Court were to assume that Flextronics was acting in its fiduciary capacity when it negotiated the deal with Verizon. Claims 2 and 6 merely parrot the language of the controlling ERISA provision. (*Compare* DE 28 at 9-11, 14 *with* ERISA § 404(a)(1)(A)(i-ii), (B), (D) and § 405. Pleadings that offer "a formulaic recitation of the elements of a cause of action" are insufficient under Rule 12(b)(6). *Iqbal*, 556 U.S. at 678. With respect to Claim 4, there must be an appointee in order for an appointing fiduciary to be liable for breaching the duty to monitor an appointee. But Marquez fails to allege definitively that there was an appointee. Instead he alleges that "to the extent that any of the specified Defendants had and/or exercised the fiduciary power to appoint other fiduciaries, [Marquez] allege[s] on information and belief that those Defendants breached their duty to monitor." (DE 28 at 12.) This is likely too

The only remaining fiduciary-breach claim is claim 5, in which Marquez alleges that Defendants breached their fiduciary duties under ERISA by denying his claim for severance benefits. (DE 28 at 13-14.) This claim is invalid because he fails to plausibly allege that Defendants did not resolve his benefits claim in accordance with the Plan's plain language. The Plan provides, in relevant part, that "[t]he Participant's termination from the Company must be involuntary, as determined by the Company. A participant who voluntarily resigns his/her employment with the Company prior to his/her actual involuntary termination date is not eligible for benefits under this Severance Plan." (DE 28-1 at 4.) In the May 2011 letter notifying Marquez and similarly situated employees that their termination date would be August 31, 2011, Flextronics states: "[t]o receive severance benefits you will also be required to remain employed by Flextronics through your Employment Termination Date . . . . If you choose to resign your employment prior to your Employment Termination Date, you will not be eligible to receive severance benefits." (DE 28-2 at 2.) Marquez alleges that he worked for Flextronics through at least August 27, 2011. (DE 28 at 6.) Defendants denied Marquez's claim for benefits because "he voluntarily resigned his position prior to the Severance Date of 8/31/11 to work for Verizon." (*Id.* at 7; DE 28-6 at 2.) Because Marquez did not work through the designated termination date of August 31, and because the Plan's language expressly provides that employees who voluntarily resign their employment before their termination date are not eligible for severance benefits, there is no evidence that the defendants abused their discretion or acted arbitrarily or capriciously in denying Marquez's benefits claim. The Court therefore dismisses claim 5.

Marquez attempts to save this claim by arguing that the Court should reform the Plan so that it provides that if Flextronics arranges for participants to be hired less than one week before their termination date, then those participants are not considered to have voluntarily resigned. Once reformed, the Court can determine that Defendants failed to pay him benefits in accordance with the reformed Plan and order them to pay those benefits. (DE 28 at 13-14; DE 35 at 16-18.)

---

speculative to constitute a plausible claim that Defendants breached their duty to monitor appointees. And even if Marquez had alleged that there was an appointee, Marquez fails to allege that any appointing fiduciary had notice or knowledge of an appointee's breach. (DE 28 at 12.) Instead Marquez conclusorily alleges that a breach of the duty to monitor must have occurred because had the appointing fiduciaries properly monitored their appointees, they would have taken action to prevent the alleged breach. *Id.* Without any facts tending to establish that the appointing fiduciaries had notice or knowledge, Marquez's claim must fail.

Reformation is not available to Marquez under claim 5 because he bases this claim on ERISA § 502(a)(1)(B) and the Supreme Court has held that this section—which "speaks of '*enforcing*' the 'terms of the plan,' not of *changing* them"—does not authorize a court to reform a plan. *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, (2011) (quoting ERISA § 502(a)(1)(B)) (brackets omitted).

Turning to Claim 1, Marquez alleges that Defendants violated ERISA § 510 by interfering with his protected rights.[5] Section 510 of ERISA makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan [or by statute], . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan [or by statute]."  Since § 510 potentially reaches "any person," Marquez does not need to allege that Flextronics was acting as a fiduciary when it negotiated with Verizon.  Section 510 has two distinct clauses protecting against two types of conduct: an exercise or anti-retaliation clause ("covering adversarial actions . . . taken because a participant availed himself of an ERISA right"), and an interference clause ("which covers interference with the attainment of a right under ERISA").  *Mattei v. Mattei*, 126 F.3d 794, 797 n.4 (6th Cir. 1997).  Marquez seeks to use the interference clause, alleging that Flextronics's negotiating with Verizon over start dates interfered with his becoming eligible for severance benefits under the Plan.  (The exercise clause does not fit the present case because Marquez was never entitled to severance benefits.  As the Court discussed above when analyzing Claim 5, Marquez was properly denied severance benefits under the Plan's terms because he did not work through the termination date.)

The parties vigorously dispute whether a § 510-interference claim requires a plaintiff to allege that the defendant interfered by taking an adverse employment action against the plaintiff. That's because Marquez has not alleged an adverse-employment action in Claim 1.  (*See* DE 28

---

[5] Although Marquez brings this Claim against Defendants, the only Defendant that the Claim could possibly be valid against is Flextronics.  The interference Marquez alleges is actionable is Flextronics's negotiating the agreement with Verizon over start dates.  Because Flextronics is the entity that engaged in this negotiation, and because Marquez does not allege in his Amended Complaint that other Defendants participated—let alone materially participated—in the negotiation, it follows that there is no valid § 510 claim against the other Defendants.  This conclusion is buttressed by the Court's holding, discussed below, that Marquez has failed to state a valid § 510 claim against even Flextronics.

at 1-9.) In a thorough opinion, the Sixth Circuit concluded that while § 510 was designed "primarily to protect the employment relationship" that gives rise to an employee's ability to attain rights under a plan, § 510's protections extend beyond the employment relationship. *Mattei*, 126 F.2d at 801. With respect to the anti-retaliation clause, *Mattei* held that § 510's laundry list of prohibited conduct—discharge, fine, suspend, expel, discipline, or discriminate—should be interpreted to mean "any adverse action." *Id.* 805-06. *Mattei* involved the anti-retaliation clause, so the Court did not have occasion to explicate the interference clause as clearly, but *Mattei* seems to suggest that § 510's prohibited conduct in the context of that clause should be interpreted to mean an adverse action that is causally connected to the plaintiff's ability to receive an identifiable benefit—that is, an adverse action that interferes with the plaintiff attaining a right under ERISA. *Id.* at 808. Although the Court finds *Mattei* persuasive, it is not binding precedent. And several other circuit courts have used language suggesting that § 510 protects only the employment relationship, which therefore means than an adverse employment action must be alleged. *E.g. Haberen v. Kaupp Vascular Surgeons Ltd. Defined Benefit Plan*, 24 F.3d 1491, 1503 (3d Cir. 1994) (reasoning that *discriminate*—the only term in § 510's list of prohibited conduct that is capable of broad interpretation—"should be limited to actions affecting the employer-employee relationship"). The Eleventh Circuit arguably falls into this camp. In *Seaman v. Arvida Realty Sales*, the Eleventh Circuit repeatedly invoked the term *discharge* or *constructive discharge* when formulating general propositions describing how to determine if § 510 claims were valid:

> [t]he validity of a § 510 claim does not hinge upon whether the benefits involved are vested but upon the purpose of the discharge. . . . This standard does not require the plaintiff to show interference with ERISA rights was the sole reason for discharge but does require plaintiff to show more than the incidental loss of benefits as a result of a discharge.

985 F.2d 543, 546 (11th Cir. 1993). Although *Seaman*'s language suggests that the Eleventh Circuit limit § 510 claims to adverse employment actions, *Seaman* does not clearly resolve the issue because Seaman, the plaintiff in that case, was in fact terminated. *Id.* at 544, 546. So the Eleventh Circuit did not need to decide whether § 510 extends beyond the employment relationship.

The Court in the present case similarly need not decide which camp the Eleventh Circuit falls into because no prejudice will result to Marquez from assuming, without deciding, the

correctness of the more narrow view that § 510 claims must allege an adverse employment action.  Marquez has not specifically alleged that he suffered an adverse employment action at Flextronics's hands.  But in his brief, he argues that Flextronics's negotiating an earlier start date with Verizon constructively discharged him.  (DE 35 at 9-10.)  He contends that the agreement forced him and similarly situated employees to choose between a job and severance benefits at a time when Florida's unemployment rate was 10.7%.  (*Id.*)  Had Flextronics not negotiated the deal with Verizon, he would have been able to work through August 31, collect his severance benefits, and still have a job at Verizon.  (*Id.*)  He instead was forced to resign early—which is constructive discharge by another name—so that he could remain employed.  (*Id.*)  And he contends that Flextronics negotiated this deal specifically to deprive him of severance benefits, thereby reducing its costs.  (*Id.*)  Had these facts been pled in his Second Amended Complaint, they would have plausibly suggested that Flextronics took an adverse action.  But they weren't, and Marquez may not amend his complaint through briefs opposing a motion to dismiss.  *Fleming v. Dowdell*, 434 F. Supp. 2d 1138, 1148 n.9 (M.D. Ala. 2005).  The Court therefore *dismisses* Marquez's Claim 1 *without prejudice*.

If Marquez were to amend his complaint to allege that he was constructively discharged, and if he were to also allege the facts adduced in his brief to support this contention—such as the 10.7% unemployment existing at the time he had to choose between having a job and getting severance benefits—he would state a plausible claim for relief.  Since Marquez can and presumably will amend his Second Amended Complaint to state a cognizable § 510 claim, he suffers no prejudice from the Court assuming, without deciding, that an adverse employment action must be alleged in the Eleventh Circuit.

That brings the Court to Marquez's final claim—Claim 7—in which he seeks declaratory relief.  Claim 7 is predicated on Defendants having committed wrongful conduct, thereby authorizing the Court to enter declaratory relief that serves to rectify that wrongful conduct.  But since the Court is dismissing Marquez's Claims 1-6, there is no plausible allegation that Marquez has committed wrongful conduct.  So there is nothing to ground the claim for declaratory relief on.  The Court therefore *dismisses* this claim.

Before concluding, there is one other matter worth discussing.  In the fact section of Marquez's Second Amended Complaint, he also alleges on information and belief that Flextronics effectively terminated him and similarly situated employees on August 27, 2011 by

ceasing its payroll on that date.  (DE 28 at 6.)  This allegation is inconsistent with several allegations in the Second Amended Complaint.  Marquez repeatedly requests as relief that the Court deem him and similarly situated employees to have not *voluntarily terminated* their employment with Flextronics so that they are eligible for full severance benefits, and to reform the Plan so that it provides that if Flextronics arranges for participants to be hired less than one week before their termination date, then those participants are not considered to have *voluntarily resigned*.  (*Id.* at 9-15.)  If Flextronics really stopped paying Marquez and the other similarly situated on August 27, then there is no need to declare that those employees did not voluntarily terminate their employment or to reform the plan in the manner Marquez seeks.  Flextronics's stopping payroll for these employees would involuntarily terminate them.  Moreover, the repeated allegations that Flextronics injured Marquez and similarly situated employees by negotiating the agreement with Verizon for an August 29 start date would be undercut.  If employees had already been terminated by Flextronics's stopping their payroll on August 27, an August 29 start date with Verizon would not matter.  The allegations that Flextronics negotiated the deal to avoid paying severance benefits would also be undercut.  And, contrary to what Marquez alleges, there would be no need for the Court to decide issues of fact and law relating to the agreement Flextronics and Verizon struck.  (*Id.* at 17.)  That deal would be irrelevant.  Although Marquez may allege facts in the alternative, the Court is struck by how much of his complaint is rendered irrelevant by the ceasing-payroll allegation.

The mystery thickens when Marquez's brief opposing the motion to dismiss is considered because the arguments in the brief proceed on the theory that the wrongful conduct is negotiating the agreement with Verizon.  The ceasing-payroll allegation is never adduced in support of substantive arguments.  For example, Marquez argues in support of his § 510 claim not that Flextronics effectively terminated him by ceasing payroll, but rather that it constructively discharged him by negotiating the Verizon agreement.  (DE 35 at 9.)  He also argues that Defendants breached their fiduciary duties by negotiating the Verizon agreement.  (DE 35 at 12 n.11.)  And Marquez's affidavit attached to the brief avers that Flextronics effectively terminated his employment on August 27, but it does not aver that it did so by ceasing payroll.  (DE 35-1 at 2.)  The affidavit could thus be interpreted as being consistent with the argument that Flextronics effectively terminated Marquez and other similarly situated employees by negotiating the deal with Verizon.

Because Marquez does not rely on the cease-payroll allegation for the arguments in his brief, and because that allegation is inconsistent with much of his Second Amended Complaint, the Court decides—as Marquez himself has apparently decided—to not rely on that allegation in the above analysis. If Marquez amends the operative complaint and he decides to keep the cease-payroll allegation, then he should precisely spell out how this allegation affects the substantive claims and either resolve the inconsistency between this allegation and the Verizon-agreement allegation, or—since resolving that inconsistency strikes the Court as being hard to do—explicitly plead his claims for relief as being alternatively based on either Flextronics's ceasing payroll or negotiating the agreement with Verizon. Marquez's attorney must also keep in mind his Rule 11 obligations when amending the operative complaint. Flextronics insists that it can offer evidence that hundreds of employees similarly situated to Marquez did in fact work through August 31. (DE 40 at 2 n.1.) The Court will not take kindly to allegations that lack a good-faith basis for believing they are true.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants' Motion (DE 31). Marquez's Second Amended Complaint (DE 28) is **DISMISSED without prejudice**. If Marquez wishes to file an amended complaint, he must do so by October 16, 2013. The motion for a oral argument (DE 41) is **denied as moot**.

**DONE AND ORDERED** in chambers in Miami, Florida on September 30, 2013.

_____
**ROBERT N. SCOLA, JR.**
**UNITED STATES DISTRICT JUDGE**